[No. D050179. Fourth Dist., Div. One. Jan. 17, 2008.]

In re B.D. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
MARILYN S., Defendant and Appellant;
B.D., Appellant.

1220

## COUNSEL

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Susan Bookout, under appointment by the Court of Appeal, for Appellant and for Minor B.D.

John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, and J. Jeffrey Bitticks, Deputy County Counsel, for Plaintiff and Respondent.

Carl Fabian, under appointment by the Court of Appeal, for Minors Adeline D., Joanna F., Israel F. and Eric F.

## OPINION

**O'ROURKE, J.**—Marilyn S. and B.D., a minor, appeal judgments terminating parental rights to B.D. and his four siblings under Welfare and Institutions Code section 366.26.[1] Marilyn also appeals orders denying her petitions for modification under section 388, which B.D. joins. The judgments and orders are affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

Marilyn S. is the 27-year-old mother of eight children. This appeal concerns five of the children, B.D., A.D., Joanna F., Israel F. and Eric F. (collectively the children).[2] The children are now 10, seven, six, five and three years respectively. In May 2004 as a result of ongoing domestic

---

[1] Unless otherwise specified, statutory references are to the Welfare and Institutions Code.

[2] The children's eldest sibling, S.D., is placed in an alternative planned permanent living arrangement. Another sibling is in the custody of her father. The youngest sibling, age one, remains in Marilyn's custody under a voluntary services plan.

violence between Marilyn and a boyfriend, Israel F.,[3] the children were adjudicated dependents of the juvenile court. B.D. and his older sister S.D. also reported that Marilyn and Israel hit them and the other children with hands, belts, hangers and a telephone cord.

At the disposition hearing, the court removed the children from Marilyn's custody and ordered a plan of family reunification services. Marilyn's case plan was focused on helping her understand the dynamics of domestic violence and its impact on her children, and to gain the stability and maturity necessary to provide a safe and secure home for her children.

The San Diego County Health and Human Services Agency (Agency) placed the five children in three foster care homes and provided services to meet their developmental and emotional needs. Joanna and Eric were placed in foster care for approximately six months and then moved to the home of a parental relative, where they remained. Two-year-old Joanna had developmental delays and behavioral problems. Eric, who was detained at birth, was happy, healthy and active.

Four-year-old A.D. was placed in foster care. In December 2004 due to behavioral problems, she was moved to another foster home with S.D. A.D. was assessed in the borderline range of mental development. She had significant language deficits and displayed severe tantrums and defiance. With continued therapy and in-home services, A.D.'s behavior improved.

B.D. and Israel had multiple placements, many of them together. Between April 2004 and May 2006, B.D. was in a relative placement, three foster homes, a group home and two temporary placements. Israel was placed with a relative, and then in three foster homes. He also had two temporary placements.

B.D., who was six years old when he was removed from Marilyn's care, was upset about not being able to live with his mother. He had problems sleeping and cried frequently for long periods of time. B.D. was diagnosed with a major depressive disorder, recurrent. His behavior and school performance improved after he was treated for attention deficit hyperactivity disorder (ADHD).

Israel was 22 months old when he was detained. Evaluators believed he was mildly mentally delayed. Israel was diagnosed with posttraumatic stress

---

[3] Israel F. is the father of Joanna and Eric. B.D., Sr., is the father of S.D., B.D. and A.D. Abel V. is the father of Israel. The children's fathers were minimally involved in the dependency proceedings, if at all, and do not appeal from the judgments terminating parental rights.

disorder and unspecified disturbance of conduct. His behaviors included defiance, sexualized conduct, eating problems, tantrums and spreading feces.

Marilyn was offered reunification services for 18 months. At the time of the 18-month review hearing, Marilyn was not attending individual therapy, had not participated in a court-ordered psychological evaluation and was not visiting the children regularly. In January 2006 the court found that she made minimal progress with her case plan and terminated reunification services.

In May 2006 the Agency requested a continuance of the section 366.26 hearing to assess the children's needs and to develop the most appropriate permanency plan for them. In September the Agency identified adoption as the preferred plan. The court authorized psychological evaluations for B.D., A.D. and Joanna to assess factors that might affect the proposed adoptions.[4] Evaluations for Joanna and A.D. were completed in October. At the time of the section 366.26 hearing in January 2007, B.D.'s evaluation had not yet been scheduled.

Rosa Grunhaus-Belzer, Ph.D., diagnosed A.D. with depressive disorder, NOS (not otherwise specified), adjustment disorder with anxiety and impulse-control disorder, NOS. Dr. Grunhaus-Belzer opined that A.D.'s temper tantrums and aggression toward others were partly related to depression and anxiety. A.D. told the psychologist that her "number one" wish was to live with her mom. Dr. Grunhaus-Belzer recommended a carefully thought-out transition plan to avert a "rocky transition and an intensification of acting out behaviors."

Elaine Spencer, Psy.D., stated that five-year-old Joanna appeared to be a good candidate for adoption by parents who were able to meet her needs and understand her background. Joanna was diagnosed with adjustment disorder with mixed emotions and conduct, and tested below average in cognitive and intellectual functioning. Dr. Spencer believed Joanna's current behavioral and emotional issues were related to the upcoming change in placement.

In November 2006 Marilyn filed petitions for modification under section 388 (modification petitions) seeking the children's return to her care. The modification hearing was heard on November 30 and December 18, 2006, and January 4, 2007. The court considered the evidence presented at the modification hearing at the section 366.26 hearing, which took place on January 4 and 12, 2007.

Marilyn testified that she had stable housing with her boyfriend and their baby. She was working at a fast-food franchise. Marilyn completed a

---

[4] Psychological evaluations are not required as part of a child's adoption assessment if the child is under the age of five, as were Israel and Eric. (Cal. Code Regs., tit. 22, § 35127.1.)

domestic violence program in November 2005 and had attended three support group sessions. There was no domestic violence in her current relationship. Marilyn believed the children's behavioral problems were due to their placement in foster care, and the children would not have problems once they were returned to her care. Marilyn stated that if she had to choose between B.D. living with his siblings or living with her, she would want B.D. to stay with siblings.

B.D. testified he wanted to return home. He did not want to be adopted with or without his siblings. B.D. said of Marilyn, "She's the best mom I ever had."

Social worker Jessica Parker opined that the risk to the children in Marilyn's care continued to be high. Marilyn gave birth to her eighth child in June 2006. She did not have stable housing during the reunification period and was currently dependent on others for her housing needs. The baby's father was on probation for an assault with a firearm in 2000 related to gang activity and had a history of methamphetamine use.

Parker believed Marilyn loved the children but her role was that of an older sibling rather than a parent. Marilyn was loving and affectionate with the children during visitation and provided clothes and shoes when she could. In view of the love and affection between Marilyn and the children, Parker did not find it easy to recommend adoption. However, returning the children to Marilyn's care was not a realistic option. No permanency plan other than adoption would allow the children to be raised together in a stable, secure home.

Parker opined that the children were adoptable. They were making good progress and all but Israel were on track academically. Eric was a very active toddler and required constant supervision. Four-year-old Israel had tantrums and developmental delays but otherwise was a healthy, socially engaging and likable child. Joanna struggled to behave, but there were no obstacles to adoption. A.D. was a sociable, engaging child. Although her behaviors were challenging, they had improved with structure.

Although B.D. did not want to be adopted, Parker believed his feelings about adoption would change once he had the opportunity to live in a stable, violence-free home with his siblings. B.D. had an affectionate relationship with Marilyn and sought her approval for his projects. If adopted, B.D. would need therapy to ameliorate the grief and loss of losing his relationship with Marilyn. He would also be grieved if his relationships with his siblings were severed.

Parker testified the children had strong, affectionate sibling relationships. B.D. and Israel had an "incredibly special bond." When A.D. was with

them, the three children held hands while they walked. The children enjoyed each other's company and supported each other. Joanna and Eric were very close to each other and enjoyed their relationships with their siblings.

Parker strongly believed the best outcome would be to keep the children together for adoption, but would consider separating the children into two groups if the Agency was not able to find an adoptive home for the sibling group of five. She was aware of a family that was interested in adopting a sibling group of five children, and had talked to them in hypothetical terms about the children. The family did not have an approved foster or adoptive home study and had not been introduced to the children.

The court found that Marilyn had made modest progress with services after reunification services were terminated, but her circumstances remained unstable. The court determined it was not in the children's best interests to return to Marilyn's care and denied the modification petitions.

B.D.'s attorney, Michael Bradfield, asked the court to identify adoption as B.D.'s permanency plan and continue the hearing for 180 days under section 366.26, former subdivision (c)(3).[5] Bradfield argued the evidence was not clear the Agency would be able to place the five siblings in an adoptive home, and it was premature to assess whether it would be detrimental to B.D. to terminate parental rights under an alternative plan. In view of B.D.'s strong feelings against adoption, Bradfield recommended the court continue the proceedings to allow B.D. to complete a psychological evaluation, meet any prospective adoptive family and participate in therapy.

The court found that although the case was complicated by the number, ages and individual interests of the children, it was likely they would be adopted within a reasonable time. The court had no doubt adoption was the best permanency plan for the younger children. In view of B.D.'s love for his mother, the court stated that long-term foster care might arguably be an appropriate option were he an only child. However, B.D.'s relationships with his siblings were exceptionally strong, and adoption would promote B.D.'s well-being to a greater extent than would long-term placement in foster care or severing his relationships with his siblings.

The court found that no exceptions to termination of parental rights outweighed the benefits that adoption would provide the children, even if they had to be separated into two sibling groups. The court terminated parental rights.

---

[5] Effective January 1, 2008, the Legislature amended and renumbered section 366.26, subdivision (c)(1). (Stats. 2006, ch. 838, § 52.) Because the proceedings at issue here occurred before the statutory change, we refer to the earlier version of the statute.

## APPELLATE PROCEEDINGS

In August 2007 counsel for A.D., Joanna, Israel and Eric (minors' counsel) informed this court that his clients and B.D. were placed with a prospective adoptive family on July 23, 2007.

On September 17, 2007, this court augmented the record to include reports and court orders filed or lodged after January 17, 2007. This court asked the parties to submit simultaneous letter briefs addressing the following: "Did the trial court err by not proceeding under Welfare and Institutions Code section 366.26, subdivision (c)(3)? If so, may this court consider the supplemental transcript here to determine whether error, if any, was harmless? Has the portion of the appeal challenging adoptability been rendered moot by subsequent proceedings?"

## DISCUSSION

## I

### *Introduction*

Marilyn contends the court abused its discretion when it denied her modification petitions to return the children to her care. She asserts insufficient evidence supports the finding the children were likely to be adopted within a reasonable time. Marilyn also argues termination of parental rights is detrimental to the children under section 366.26, former subdivision (c)(1)(A), (E).

B.D. contends insufficient evidence supports the finding he was likely to be adopted, with his siblings or separately, within a reasonable time. He argues the court should have granted his request to continue the permanency plan hearing under section 366.26, former subdivision (c)(3). B.D. asserts he may become adoptable if placed in an approved adoptive home with his siblings.

The Agency maintains the court properly denied Marilyn's modification petitions and contends Marilyn has not met her burden on appeal to show that no substantial evidence supports the court's findings under section 366.26, former subdivision (c)(1). Minors' counsel joins the Agency's opening brief.

## II

*The Court Did Not Abuse Its Discretion When It Denied*
*Marilyn's Petitions for Modification Under Section 388*

Marilyn asserts the court abused its discretion when it denied her modification petitions. She contends she proved changed circumstances and new evidence that demonstrated the children's return to her care was in their best interests. Marilyn argues she satisfied all the conditions the Agency imposed: She severed her relationship with the perpetrator of domestic violence, completed a 52-week domestic violence program, was in a stable relationship with the father of her baby, visited the children regularly and had resumed therapy. Marilyn also asserts she had appropriate housing and an adequate income for herself and the children, and her children longed to be with her.

The Agency contends Marilyn had not made substantive changes and therefore did not show a " 'genuine' . . . change of circumstances." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 447–448 [38 Cal.Rptr.3d 876].) It asserts the evidence shows that Marilyn did not complete her case plan and lacked the maturity and insight to provide a stable home for her children and to meet their emotional, behavioral and developmental needs.

██ Under section 388, a parent, interested person or the dependent child (generically, petitioner) may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petitioner has the burden to show a change of circumstances or new evidence and the proposed modification is in the child's best interests. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297].) Generally, the petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought. (Cal. Rules of Court, rule 5.570(f)(1).)

We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71 [43 Cal.Rptr.3d 897]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 [82 Cal.Rptr.2d 426].) While the abuse of discretion standard gives the trial court substantial latitude, "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.]" (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704].)

In evaluating whether the petitioner has met his or her burden to show changed circumstances, the trial court should consider: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 [65 Cal.Rptr.2d 495] ["While this list is not meant to be exhaustive, it does provide a reasoned and principled basis on which to evaluate a section 388 motion."].)

Here, the children were removed from Marilyn's custody because of their exposure to domestic violence and physical abuse. The case continued because Marilyn did not complete her case plan, relied on others for housing and support and was not able to place her children's needs first. She stopped attending therapy in September 2006, which was a prerequisite to participating in conjoint counseling with the children and understanding their needs. Marilyn did not visit the children when she became upset with the social worker and caregivers.

Social worker Parker opined that the risk to the children in Marilyn's care continued to be high. After several years of services, Marilyn did not understand the impact that her inability to provide structure, stability and consistency had on the children. During visits, Marilyn was unable to consistently discipline and control the children. Parker did not believe Marilyn had the ability to meet the children's emotional, behavioral and developmental needs.

Marilyn did not complete a court-ordered psychological evaluation until the court terminated reunification services and set a section 366.26 hearing. The evaluating psychologist reported that Marilyn's home had been one of "transience and instability both financially and emotionally." Marilyn was dependent on others. In the past, she was pathologically dependent on a man who had battered her. While in her care, the children received very poor structure and parenting and were not protected from violence and physical abuse. Marilyn did not see the connection between the conditions in her home and the children's problematic behaviors.

The psychologist concluded that Marilyn's goal of caring for the children was unrealistic in view of her lack of responsibility and independence, and her limited means to care for the children. Further, Marilyn's passivity and dependency presented a risk of exposure to the children of domestic violence or physical or sexual abuse from others.

Marilyn did not inform the psychologist that she was five months pregnant at the time of the evaluation or that the baby's father was then incarcerated for assault with a firearm and had a recent history of methamphetamine use. Thus, the court could conclude that the predictive risks noted by the psychologist in Marilyn's evaluation were present in her life and presented a serious current risk to the children's safety and well-being.

The court reasonably determined Marilyn's circumstances were not sufficiently changed to permit the safe return of the children to her care. Despite offered services, Marilyn did not show she was able to offer the children a structured, secure and protective environment free from the risk of abuse and neglect. She did not understand the difficulty in caring and providing for children who had significant and varied emotional, behavioral and developmental needs. (Cf. *In re Dakota H.* (2005) 132 Cal.App.4th 212, 230 [33 Cal.Rptr.3d 337].) Marilyn was dependent for support on a person with a history of violence and substance abuse. Thus, the problem that initially brought the children within the dependency system had not been removed or ameliorated. (*In re Kimberly F., supra*, 56 Cal.App.4th at pp. 531–532.)

 In view of the children's needs and Marilyn's current circumstances, the court reasonably found that it was not in the children's best interests to be returned to Marilyn's care. We conclude the court did not abuse its discretion when it denied Marilyn's petitions to return the children to her care.

III

*Section 366.26, Former Subdivision (c)(1)*

A. *Introduction*

Marilyn contends the court's finding the children were likely to be adopted within a reasonable time (adoptability finding) is not supported by substantial evidence. She argues the children are strongly bonded to each other and need to retain their sibling ties; thus the size of the sibling group and the children's emotional, developmental and behavioral problems belie a finding that they are specifically or generally adoptable. Marilyn further contends substantial evidence does not support a finding that B.D. was adoptable because he consistently and adamantly opposed adoption.

B.D. argues the court's finding that termination of parental rights would not be detrimental to him was premised on the condition that he would be adopted with his siblings. B.D. contends the court erred when it terminated parental rights in the absence of clear and convincing evidence the Agency would be able to meet this condition. He argues the children's proposed

adoptive placement with a family not yet screened for factors required in the assessment report under section 366.22, subdivision (b) does not constitute substantial evidence that B.D., as a member of a bonded sibling group, would be adopted within a reasonable time. (Cf. *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 956 [124 Cal.Rptr.2d 688].) B.D. also asserts he was not generally adoptable in view of his unequivocal opposition to losing his relationship with his mother.

The Agency argues the children are generally and specifically adoptable based on the number of families interested in adopting the children "individually and in groups" and the existence of a family interested in adopting all five children.

B. *Statutory Framework*

At a section 366.26 hearing, the court may (1) terminate parental rights and free the child for adoption, (2) identify adoption as the permanency plan goal and continue the hearing for no more than 180 days to locate an appropriate adoptive home for the child, (3) appoint a legal guardian, or (4) order the child's placement in long-term foster care. (§ 366.26, subd. (b).) At all proceedings under section 366.26, the court must consider the wishes of the child and act in the best interests of the child. (§ 366.26, subd. (h)(1).)

To select adoption as the permanency plan, the court must find by clear and convincing evidence the child is likely to be adopted within a reasonable time. The fact that the child is not yet placed with a family prepared to adopt the child, "shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, former subd. (c)(1).) If the court finds that the child is likely to be adopted, it must order adoption unless termination of parental rights would cause serious detriment to a child under one or more specific statutory exceptions. (*Ibid.*; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 [32 Cal.Rptr.2d 535].)

C. *Adoptability*

A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 [2 Cal.Rptr.3d 683, 73 P.3d 541] (*Zeth S.*).) The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].)

If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. (*In re Scott M.* (1993) 13

Cal.App.4th 839, 844 [16 Cal.Rptr.2d 766].) When the child is deemed adoptable based solely on a particular family's willingness to adopt the child, the trial court must determine whether there is a legal impediment to adoption. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061 [27 Cal.Rptr.3d 612].) The juvenile court should also explore a child's feelings toward his or her parents, foster parents and prospective adoptive family. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 820 [64 Cal.Rptr.2d 108]; *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1334 [50 Cal.Rptr.3d 57]; see § 366.26, subd. (h)(1).)

On review, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561–1562 [25 Cal.Rptr.3d 134]; see also *Zeth S., supra*, 31 Cal.4th at p. 406.) The evidence must be sufficiently strong to command the unhesitating assent of every reasonable mind. (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205–1206 [101 Cal.Rptr.2d 449].) We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the trial court. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.)

Here, social worker Parker opined that the children were adoptable. Although A.D., Joanne and Israel had problems, they had made progress. Parker acknowledged B.D. and A.D. wanted to return to Marilyn's care, and B.D. would require a long therapeutic process before he would accept adoption. Because of his opposition, the Agency would "take a transition more slowly." In discussing A.D.'s need for a carefully structured transition, Parker stated, "The transition period is going to be very big in this case in making sure we are not moving too quickly."

Parker strongly believed the children should be placed for adoption as a sibling group of five, and stated, "I am passionate about doing everything in my power as a social worker to place the kids together." Parker testified if the Agency could not find an adoptive home for the sibling group of five, it would place Eric and Joanne in one adoptive home, and B.D., A.D. and Israel in another.

In the general database of families interested in adopting a child or a sibling group, Parker found seven families that had expressed interest in adopting a child with B.D.'s characteristics, 18 families interested in a child like A.D., 26 in a child like Joanna, 22 in a child like Israel and 33 in a child with Eric's characteristics. Eight or nine families were interested in adopting a sibling pair like A.D. and Israel, and the same number had expressed an interest in a adopting a sibling pair like Joanna and Eric. Parker also found on

the database five approved out-of-county families that were interested in adopting a sibling group like the children.

We are not persuaded by the Agency's argument that the number of families interested in adopting the children "individually and in groups" supports a finding the children are generally and specifically adoptable. (See, e.g., *In re Asia L.* (2003) 107 Cal.App.4th 498, 512 [132 Cal.Rptr.2d 733] [children's emotional and psychological development present a potential obstacle to adoption and require a specialized placement]; *In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065 [280 Cal.Rptr. 503] [reports indicating a few families were considering adoption does not constitute clear and convincing evidence to establish the likelihood of adoption]; *In re Brian P.* (2002) 99 Cal.App.4th 616, 624 [121 Cal.Rptr.2d 326] [a social worker's conclusion alone is insufficient to support an adoptability finding].)

Parker was not considering homes that only wanted a single child. She acknowledged that it would not be easy to find a suitable adoptive home for the sibling group. Parker testified if the Agency's efforts to place the children together were not successful, then the Agency would separate the children into two groups after it had exhausted placement possibilities for the adoption of the five children as a sibling group. We note there is no evidence in the record to support a finding that B.D., A.D. and Israel were likely to be adopted as a sibling group within a reasonable time.

The Agency contends the presence of one family that had expressed an interest in adopting a sibling group constitutes substantial evidence of the children's adoptability. We are not persuaded by this contention. The record shows the family did not have a foster care license or an approved adoptive home study. Because of their status, Parker could not provide specific information to the family about the children and spoke to them in "hypotheticals" about "more extreme behaviors." Parker "hoped" the family would be approved for foster care licensing in February 2007, but declined to speculate on when the family's adoptive home study would be completed.

■ Although the foster care and adoptive home studies for the family were in progress, we believe the absence of a foster care license or a preliminary assessment constitutes a legal impediment to adoption.[6] It prevents a social worker from providing information about the children to the

---

[6] The record does not indicate the Agency had completed a preliminary assessment of the family. (Cf. *In re L. Y. L., supra,* 101 Cal.App.4th at p. 956; *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1481 [13 Cal.Rptr.2d 645].) A preliminary assessment includes a social history of all the adults in the proposed relative or foster care home, including screening for criminal records, prior referrals for child abuse and neglect, the capacity to meet the minor's needs and other requirements. (§§ 366.21, subd. (i), 366.22, subd. (b).) Although the family

family, facilitating contact between the children and the family and placing the children in a preadoptive placement with the family. Thus, here, there was a legal impediment to adoption by the only family that had expressed a specific interest in adopting the children at the time of the section 366.26 hearing. (*In re Carl R., supra*, 128 Cal.App.4th at p. 1061.)

In addition, this is not a case in which the children had any previous relationship with a family interested in adopting them. The record shows that once an approved prospective adoptive parent was identified, the transition process would be lengthy, especially with respect to B.D. and A.D. Parker voiced concern about proceeding "too quickly" for A.D. and opined that B.D.'s adoption would require a long therapeutic process. B.D.'s therapy was discontinued in August 2006 due to a change in placement and had not been rescheduled. B.D.'s psychological evaluation, authorized by the court in September 2006, had not been scheduled at the time of the section 366.26 hearing. Thus, the record does not indicate the therapeutic issues would be resolved, or that a transition to an approved adoptive placement would be completed, within a reasonable time.

### D. *Beneficial Parent-child Relationship Exception*

Marilyn asserts the court erred when it determined the beneficial parent-child relationship exception under section 366.26, former subdivision (c)(1)(A) did not apply to preclude termination of parental rights. She contends she maintained consistent and regular visitation with the children and had strong and close relationships with the children, particularly with B.D., A.D. and Joanna.

Section 366.26, former subdivision (c)(1)(A) provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We recognize that interaction between parent and child will usually confer some incidental benefit to the child. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) To overcome the statutory preference for adoption, the parent must prove he or she occupies a parental role in the child's life resulting in a significant, positive emotional attachment of the child to the parent. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 [86 Cal.Rptr.2d 739]; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [60 Cal.Rptr.2d 557].)

When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous

had adopted in the past, the record shows that one of their sons entered the dependency system at age eight or nine and was now an adult; thus we cannot infer the earlier home study was a relatively recent evaluation.

placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of "a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

We determine whether there is substantial evidence to support the court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 [3 Cal.Rptr.2d 217].) The reviewing court must affirm a trial court's rejection of these exceptions if the ruling is supported by substantial evidence. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 [92 Cal.Rptr.2d 20].)

Marilyn does not meet her burden on appeal to show there is insufficient evidence to support the court's determination that the parent-child relationship was outweighed by the security and sense of belonging that adoption would confer on each child. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) When the children were in Marilyn's care, they were subjected to physical abuse and exposed to domestic violence. Israel and Eric were less than two years old when removed from her care, and Joanna had just turned three. They have spent a significant portion of their lives with other caregivers. Although B.D. and A.D. lived with Marilyn for a substantial period of their lives and wanted to return to her care, Parker believed they were seeking a protective, nurturing parent who would be able to provide the security of a safe and stable home and were too young to realize that Marilyn could not meet their needs.

Parker opined Marilyn was more like an older sibling to her children than a parent. Marilyn's therapist reported that Marilyn was "immature in her parenting skills." Examples of Marilyn's immaturity included having men in her home during the children's unsupervised visits, not visiting the children because she was upset with the social worker and caregivers, lying to B.D. and the social worker about the birth of her youngest child and becoming dependent on a man who had a criminal and substance abuse history.

The children had emotional, developmental and behavioral needs that required stability, consistency and structure. After several years of services, Marilyn did not understand the impact of her lack of consistent parenting on the children and her inability to meet their special needs. (*In re Dakota H., supra*, 132 Cal.App.4th at pp. 230–231.) We conclude that substantial evidence supports the court's finding that the security of a permanent home

with committed, capable and loving adoptive parents outweighed the children's interest in continuing their relationships with Marilyn. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

E. *Sibling Relationship Exception*

Marilyn contends the court erred when it did not apply the sibling relationship exception under section 366.26, former subdivision (c)(1)(E). She argues the Agency's plan to find an adoptive home for the sibling group was speculative, and therefore the court could not have properly found the exception did not apply.

The Agency maintains substantial evidence supports a finding that adoption would not substantially interfere with the siblings' relationships under the alternative plans approved by the court and, to the extent it did, the children's individual interests in adoption outweighed their interests in maintaining their sibling relationships.

An exception to termination of parental rights exists when termination of parental rights would cause "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship . . . ." (§ 366.26, former subd. (c)(1)(E).) Here, the record leaves no doubt the nature and extent of the children's sibling relationships were strong and important, and the parties and the court believed that maintaining the sibling relationships were crucial.

The sibling relationships were the basic foundation of the proposed permanency plan. Parker was "passionate" about doing everything within her power to keep the children together. Marilyn believed B.D.'s relationships with his siblings were more important than was his relationship with her. The court found that "what ties everything together then is the connection between the siblings and how important it is. These kids know each other and love each other."

In view of our previous discussion about the sufficiency of the evidence to support a finding the children were likely to be adopted as a sibling group, we agree with Marilyn's assertion the determination of the sibling relationship exception was premature. This court has previously held that where there are tentative alternative plans for adoption and one plan may substantially interfere with the sibling relationship, the better approach is to continue the hearing until the uncertainty has been resolved. (*In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422 [35 Cal.Rptr.3d 577].) However, as we discuss *post* at pages 1240–1241, the postjudgment evidence shows the children have been placed together in an adoptive home; therefore the contention that termination

of parental rights would cause substantial interference with the sibling relationships has been rendered moot by subsequent proceedings. (133 Cal.App.4th at p. 1422.)

IV

*Consideration of Postjudgment Evidence*

A. *Introduction*

At trial, B.D.'s attorney asked the court to continue the section 366.26 hearing for 180 days to see whether the Agency would be able to place him with his siblings in an adoptive home. (§ 366.26, former subd. (c)(3).) In his opening brief, B.D. argues the court erred when it did not proceed under section 366.26, former subdivision (c)(3). The parties did not respond to B.D.'s argument in initial briefing. We requested further briefing whether the trial court erred when it did not continue the hearing and, if so, whether this court may consider postjudgment evidence in its assessment of the issues raised on appeal.

In view of his current circumstances, B.D. posits that the court's error in not proceeding under section 366.26, former subdivision (c)(3) was harmless, and his argument concerning adoptability has been rendered moot. B.D. contends *Zeth S.* does not bar consideration of postjudgment evidence to avoid further delay of his opportunity for stability and permanence in an adoptive home with his siblings. (*In re Salvador M., supra,* 133 Cal.4th at p. 1422.)

Marilyn contends the court should not have proceeded under section 366.26, former subdivision (c)(3) because the exceptions under section 366.26, former subdivision (c)(1)(A), (E) applied to preclude termination of parental rights. Marilyn asserts this court should not consider postjudgment evidence in determining whether the court erred when it found the children were likely to be adopted within a reasonable time. (*Zeth S., supra,* 31 Cal.App.4th at p. 406.)

The Agency contends the court acted within its discretion when it did not continue the section 366.26 hearing for 180 days. The Agency argues that despite the children's behavioral problems and B.D.'s opposition to adoption, the evidence showed the children were likely to be adopted within a reasonable time. Alternatively, the Agency argues that if the court erred by not continuing the section 366.26 hearing, any error is harmless and the issue of adoptability has been rendered moot by the children's adoptive placement.

Minors' counsel argues the court did not err when it did not continue the hearing for 180 days. He acknowledges the children were difficult to place as a sibling set of five, but asserts the statute did not apply because there was an identified prospective adoptive family at the time of the section 366.26 hearing. Minors' counsel argues any procedural error was harmless and has been rendered moot. Finally, minors' counsel contends that if this court concludes postjudgment evidence should be received, the issue of adoptability is also moot. (*In re Sarah M., supra,* 22 Cal.App.4th at pp. 1649–1650.)

## B. *Section 366.26, Former Subdivision (c)(3)*

██ When a child's needs or circumstances make the child particularly difficult to place for adoption, the court may identify adoption as the permanency plan goal and give the Agency additional time to find an appropriate adoptive home. (§ 366.26, former subd. (c)(3); *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1433–1434 [36 Cal.Rptr.3d 847].) If the court has determined that termination of parental rights would not be detrimental to the child under the exceptions listed in section 366.26, former subdivision (c)(1), the court may continue the section 366.26 hearing if it finds that "the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent . . . ." (§ 366.26, former subd. (c)(3).)

██ "A child is considered difficult to place for adoption only if the lack of a current placement is due to 'the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is the age of seven years or more.' " (*In re Gabriel G., supra,* 134 Cal.App.4th at p. 1434, quoting § 366.26, former subd. (c)(3).) If these circumstances apply, the court may identify adoption as the permanency plan goal and, without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. "Although difficult to place initially, the child's odds for adoption may improve to 'likely' by the end of the 180-[day] period . . . ." (*In re Y.R.* (2007) 152 Cal.App.4th 99, 110 [60 Cal.Rptr.3d 820].)

Here, the record supports a finding that the children had a probability of adoption but were "difficult to place." (§ 366.26, former subd. (c)(3); see *In re Y.R., supra,* 152 Cal.App.4th at pp. 109–110.) The children were members of a sibling group of five, several of whom had diagnosed mental handicaps. (*In re Gabriel G., supra,* 134 Cal.App.4th at pp. 1433–1434; *In re Asia L., supra,* 107 Cal.App.4th at p. 512.) Two of the children were, or

would soon be, seven years old or older,[7] an age at which children are generally considered unlikely to be adopted. (*In re Salvador M., supra*, 133 Cal.App.4th at p. 1422.) One of the older children was adamantly opposed to adoption, and the other would consider adoption only on the condition she was able to stay with her siblings.

The Agency posits section 366.26, former subdivision (c)(3) did not apply because the children were adoptable. As we have discussed, the evidence does not support a finding that the children were likely to be adopted within a reasonable time. Minors' counsel contends the statute did not apply because there was an identified prospective adoptive parent at the time of the section 366.26 hearing. For reasons previously discussed, see *ante* at pages 1233–1234, we do not believe the family identified at the time of the section 366.26 hearing can be characterized as a "prospective adoptive" family within the meaning of section 366.26, former subdivision (c)(3). (Cf. *In re L. Y. L., supra*, 101 Cal.App.4th at p. 956.) We also discussed the inapplicability of the beneficial parent-child exception under section 366.26, former subdivision (c)(1)(A). Thus contrary to Marilyn's contention, the exception does not preclude a continuance under section 366.26, former subdivision (c)(3).

Throughout the proceedings, the Agency explicitly and implicitly acknowledged the children were difficult to place as a sibling group of five, and their behaviors and needs would challenge a competent family. Further, without the additional procedural protections of section 366.26, former subdivision (c)(3), the risk that B.D. would be left a legal orphan or would suffer detriment as a result of termination of parental rights was unacceptably high. (*In re Carl R., supra*, 128 Cal.App.4th at p. 1062, fn. 6 ["Legal orphanage is a consequence the law abhors."].) Under these circumstances, we conclude the better practice is to continue the hearing under section 366.26, former subdivision (c)(3) to allow the Agency to identify a qualified prospective adoptive parent willing to adopt the children as a sibling group. (*In re Gabriel G., supra*, 134 Cal.App.4th at p. 1434; cf. *In re Salvador M., supra*, 133 Cal.App.4th at p. 1422.)

### C. *We Consider Postjudgment Evidence to Determine Whether the Error Was Harmless*

"It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' "

---

[7] At the time of the section 366.26 hearing, B.D. was nine years old. A.D. celebrated her seventh birthday less than three weeks later.

(*Zeth S., supra*, 31 Cal.4th at p. 405, quoting *In re James V.* (1979) 90 Cal.App.3d 300, 304 [153 Cal.Rptr. 334].) The state has a strong interest in expediting dependency proceedings and promoting the finality of the court's orders and judgment. (*Zeth S., supra*, at pp. 412–413.)

In *In re Salvador M., supra*, 133 Cal.App.4th at pages 1421–1422, this court permitted a party to augment the record on appeal to demonstrate that the issues raised in the appeal were moot and the appeal should be dismissed. This court noted that, unlike the postjudgment evidence at issue in *Zeth S.*, the postjudgment evidence before it was not the unsworn statement of counsel. The evidence would have been admissible and relevant if known to the court, and the party's purpose in requesting the augmented record was to promote the finality of the juvenile court's judgment. (*Ibid.*; see also *In re Josiah Z.* (2005) 36 Cal.4th 664, 676 [31 Cal.Rptr.3d 472, 115 P.3d 1133].)

Here, to avoid further delay and to promote the finality of the judgment, we augment the record on appeal to include the Agency's addendum reports and the court's orders contained in the supplemental clerk's transcript filed September 27, 2007. (*In re Salvador M., supra*, 133 Cal.App.4th at p. 1422.) The augmented record shows the family identified at the section 366.26 hearing withdrew from consideration, as did an out-of-state family several months later and a local family in June 2007. Eric was diagnosed with ADHD, oppositional defiant behavior and suspected developmental delays. Israel continued to receive services for developmental delays, and his behavior improved. With structure and support, A.D. and Joanna stabilized their behaviors. B.D. remained opposed to adoption until Marilyn talked to him and emphasized the importance of staying with his siblings.

On July 11, 2007, the Agency reported that B.D., A.D., Joanna, Israel and Eric are "a bonded sibling group [that has] waited a long time for an adoptive family. The Agency has located a family that . . . can meet the special needs of these children. The Interstate Compact Placement of Children (ICPC) has approved the placement of these children." On July 13 the court authorized the children's placement in the approved adoptive home effective July 23.

The augmented record shows the Agency identified an adoptive home for the children within 180 days of the section 366.26 hearing. Thus, the postjudgment evidence shows the issue of adoptability has been rendered moot by the children's subsequent placement in an approved adoptive home,[8] and any procedural error was harmless. We are mindful however "[t]hat

---

[8] In contrast with the evidence of adoptability presented at the section 366.26 hearing, the supplemental record shows that by June 2007, in addition to an approved adoptive family under consideration, the Agency had identified 10 other families eligible to adopt all five children. Several of the families had specifically requested the children.

subsequent events bore out this speculation is little more than happenstance, which normally should not be the basis of court orders and judgments." (*In re Salvador M., supra,* 133 Cal.App.4th at p. 1422.) In view of the children's placement together in an approved adoptive home, we see no reason to further delay the proceedings. (*Ibid.*)

## DISPOSITION

The judgments and orders are affirmed.

Nares, Acting P. J., and Irion, J., concurred.